**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TARA MCCALVIN, GHANI SMITH, HOLLI WISE, JAMES C. DEVIESE and THERESA DEVIESE<br><br>*on behalf of themselves and all others similarly situated*<br>Plaintiffs,<br><br>vs.<br><br>CONDOR HOLDCO SECURITIZATION TRUST, CONDOR ASSETCO SECURITIZATION TRUST & CONDOR RECOVERY SECURITIZATION TRUST,<br>Defendants. | CLASS ACTION<br><br><br><br>CIVIL ACTION NO. 17-cv-01350(TJS) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
AND AWARD OF CLASS COUNSEL FEES AND COSTS**

**\*\*\***

**CERTIFICATIONS AND EXHIBITS IN SUPPORT THEREOF**

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ............................................................................................ 1

II.  FACTS, PROCEDURAL HISTORY, AND MAILING OF NOTICE ................................ 2

III. NATURE OF THE SETTLEMENT .................................................................... 3

   A.  Key Settlement Terms .......................................................................... 3

   B.  Aggregate Value to Class Includes Debt Forgiveness and Credit Correction ................... 3

IV.  LEGAL ARGUMENT ..................................................................................... 5

   A.  The Settlement Enjoys the Presumption of Fairness ........................................... 5

   B.  Final Approval Should be Granted ............................................................ 6

      1.  The Complexity, Expense and Likely Duration of the Litigation ........................... 7

      2.  The Reaction of the Class to the Settlement Has Been Excellent .......................... 7

      3.  The Stage of the Proceedings and the Amount of Discovery Completed ..................... 8

      4.  The Risks of Establishing Liability and Damages ....................................... 9

      5.  The Risks of Maintaining the Class Action Through Trial ................................ 10

      6.  The Ability of the Defendant to Withstand a Greater Judgment ........................... 10

      7.  The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and Attendant Risks of Litigation (*Girsh* Factors 8 and 9) ................................ 11

      8.  Additional Factors All Support Grant of Final Approval ................................. 12

   C.  Class Representative Service Awards ......................................................... 13

   D.  Cy Pres Distribution of Unremitted Funds .................................................... 13

   E.  The Class Should be Certified ............................................................... 14

   F.  Class Counsel Fees are Reasonable and Should be Approved .................................... 14

      1.  The Equitable Foundation for Award of Attorneys' Fees in Representative Actions 14

i

2.      Plaintiffs' Fee Request from the Common Fund is Fair and Reasonable and In Line With Awards Approved in Similar Cases .................................................................... 15

   a.      The size and nature of the common fund created, and the number of persons benefited.................................................................................................. 16

   b.      The absence of objections to the request for fees supports approval..................... 17

   c.      The skills and efficiency of Class Counsel ........................................................... 17

   d.      The complexity and duration of the litigation....................................................... 19

   e.      The risk of nonpayment ........................................................................................ 21

   f.    The amount of time devoted to the litigation .......................................................... 22

   g.      Awards in similar cases ........................................................................................ 23

3.      Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee............. 24

4.      Reimbursement of Class Counsel's Expenses........................................................... 29

V.   CONCLUSION................................................................................................................. 30

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................... 15

*Bell Atl. Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993) ........................................................................... 8

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ................................................................................... 14

*Brown v. Rita's Water Ice Franchise Co. LLC*,
  242 F. Supp. 3d 356 (E.D. Pa. 2017) ........................................... 13, 15, 29

*Ciccarone v. B.J. Marchese, Inc.*,
  2004 WL 2966932 (E.D. Pa. Dec. 22, 2004) ........................... 4, 15, 16, 23

*Cosgrove v. Citizens Auto. Fin., Inc.*,
  2011 WL 3740809 (E.D. Pa. Aug. 25, 2011) ................................... passim

*Coxall v. Clover Commercial Corp.*,
  781 N.Y.S.2d 567 (N.Y. Cty. Civ. Ct. 2004) ............................................. 9

*Craig v. Rite Aid Corp.*,
  No. 08-2317, 2013 WL 84928 (M.D. Pa. Jan. 7, 2013) ........................... 18

*Cubler v. Trumark Fin. Credit Union*,
  83 A.3d 235 (Pa. Super Ct. 2013) ........................................................ 9, 27

*Deposit Guar. Nat'l Bank v. Roper*,
  445 U.S. 326 (1980) ................................................................................... 15

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975) ........................................................ 6, 7, 10, 11

*Good v. Nationwide Credit, Inc.*,
  314 F.R.D. 141 (E.D. Pa. 2016) ................................................................ 12

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000) ......................................................... passim

*Homer v. Law Offices of Frederic I. Weinberg & Assocs., P.C.*,
  No. 17-880, 2018 WL 2239556 (E.D. Pa. May 16, 2018) ........................ 27

*In re AT&T Corp.,*
    455 F.3d 160 (3d Cir. 2006).................................................................. 15

*In re Baby Products Antitrust Litig.,*
    708 F.3d 163 (3d Cir. 2013).................................................................. 13

*In re Cendant Corp. Prides Litig.,*
    243 F.3d 722 (3d Cir. 2001)................................................... 15, 24, 27

*In re Cendant Corp.,*
    264 F.3d 201 (3d Cir. 2001).................................................................. 14

*In re Constar Int'l Inc. Sec. Litig.,*
    585 F.3d 774 (3d Cir. 2009).................................................................. 15

*In re Diet Drugs Prod. Liab. Litig.,*
    553 F. Supp. 2d 442 (E.D. Pa. 2008) .................................................. 17

*In re Diet Drugs,*
    582 F.3d 524 (3d Cir. 2009 .................................................................. 16

*In re Flonase Antitrust Litig.,*
    291 F.R.D. 93 (E.D. Pa. 2013).............................................................. 17

*In re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995).......................................................... 7, 14, 15

*In re Ikon Office Solutions, Inc, Sec. Litig.,*
    194 F.R.D. 166 (E.D. Pa. 2000)............................................................ 18

*In re NFL Players Concussion Injury Litig.,*
    821 F.3d 410 (3d Cir.), *as amended* (May 2, 2016)....................... passim

*In re Prudential,*
    148 F.3d 283 (3d Cir. 1998)................................................... 6, 12, 15, 16

*In re Rite Aid,*
    396 F.3d 294, 305 (3d Cir. 2005)……………………………………..17, 24, 25

*In re Warfarin Sodium Antitr. Litig.,*
    391 F.3d 516 (3d Cir. 2004)................................................................... 7

*Indus. Valley Bank & Trust Co. v. Nash,*
    502 A.2d 1254 (Pa. Super. Ct. 1985)..................................................... 9

*Lawsky v. Condor Capital Corp.*,
   154 F. Supp. 3d 9 (S.D.N.Y. 2015) ........................................................ 19

*McCall v. Drive Fin.*,
   2010 WL 4150875 (Phila. CCP July 21, 2010) ..................................... 24

*McCoy v. Health Net, Inc.,*
   569 F. Supp. 2d 448 (D.N.J. 2008) ......................................................... 9

*Mehling v. New York Life Ins. Co.*,
   248 F.R.D. 455 (E.D. Pa. 2008) ............................................................. 18

*Perry v. Fleet Boston Fin. Corp.*,
   229 F.R.D. 105 (E.D. Pa. 2005) ......................................... 13, 15, 17, 24

*Reibstein v. Rite Aid Corp.*,
   761 F.Supp.2d 241 (E.D. Pa. 2011) ......................................................... 9

*Savoy v. Beneficial Consumer Discount Co.*,
   503 Pa. 74, 468 A.2d 465 (1983) ........................................................... 11

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011) .................................................................. 11

*Swedish Hosp. Corp. v. Shalala*,
   1 F.3d 1261 (D.C. Cir. 1993) ................................................................ 14

*Trustees v. Greenough*,
   105 U.S. 527 (1882) .............................................................................. 14

*Wallace v. Powell*,
   No. 09-0291, 2015 WL 9268445 (M.D. Pa. Dec. 21, 2015) .................. 21

**Statutes**

13 Pa. C.S. § 9625(c) ................................................................................ 9, 18

15 U.S.C. § 1681c(a) ...................................................................................... 4

15 U.S.C. § 1681c(c) ...................................................................................... 4

**Other Authorities**

Lea Shepard, *Seeking Solutions to Financial History Discrimination*,
   46 Conn. L. Rev. 993 (2014) ..................................................................... 4

*Report of the Third Circuit Task Force, Selection of Class Counsel,*
   208 F.R.D. 340 (2002) ........................................................................................................ 25

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ 1, 2, 10

Fed. R. Civ. P. 23(a) .................................................................................................. 14

Fed. R. Civ. P. 23(b)(3) .............................................................................................. 14

## I.  __INTRODUCTION__

Plaintiffs Tara Mccalvin, Ghani Smith, Holli Wise, James C. Deviese, and Teresa Deviese move under Federal Rules of Civil Procedure 23 for final approval of a nationwide class settlement.

The terms and conditions are set forth in the Settlement Agreement executed June 22, 2018 (the "Settlement Agreement"), a copy of which was presented to the Court and preliminarily approved by Order entered August 8, 2018 (ECF 90).  The Settlement Agreement, attached as Exhibit "1," reflects an excellent result including a cash fund of $5.7 Million, valuable equitable-type relief in correction of consumer credit reports, and the waiver of over $14 Million in auto loan deficiency balances – of clear and unquestionable value to Class members – claimed due by Defendants, the Trusts.[1]

Notice of the proposed nationwide class action settlement was mailed as directed by the Court to Class Member borrowers and co-obligors whose names appeared in Defendants' records. (Exhibit 2, Aff't of Class Administrator, ¶¶ 3–8).  The Notice informed Class Members of the terms and benefits that the settlement proposes, and that they had the right to exclude themselves from the Class or object to the settlement.  (*See* Exhibit 1 at Ex. "C" thereto, Notice ¶¶ 1–7, 13–15, 18–19).  The Notice also advised Class Members that Plaintiffs would be applying for an award of attorneys' fees of up to $2,280,000 and cost reimbursement up to $32,500, subject to review and approval of the Court.  (Id. ¶ 17).

After mailing to 3,245 Class Members (concerning 2890 secured obligations), only <u>one</u> Class Member has requested to be excluded from the settlement and there have been <u>no</u> objections. (Exhibit 2, Aff't of Class Administrator, ¶¶ 11–12).  Only four Class Members have elected not to

---

[1]      Plaintiff refers to Defendants Condor Holdco Securitization Trust, Condor Assetco Securitization Trust, and Condor Recovery Securitization Trust collectively as the "Trusts."

accept debt forgiveness.  (Id. ¶ 13).  This essentially unanimous endorsement of the Class to the terms of the proposed settlement strongly favors final approval.

As discussed below, the settlement is eminently fair and reasonable, and is in the best interest of the Class.  The settlement satisfies all of the criteria that courts routinely apply in this Circuit for the approval of class action settlements.  The settlement represents, we would respectfully submit, a superlative result for the consumer Class Members and should be approved, as should the awards to the Representative Plaintiffs and the application for Class Counsel fees and costs.  Finally, the Court should formally certify the Class for settlement purposes under Rule 23.

## II.     FACTS, PROCEDURAL HISTORY, AND MAILING OF NOTICE

The Court is familiar with the facts of this case, having presided over the matter since it was filed on March 24, 2017.  In the interests of brevity, Plaintiffs incorporate the facts and procedural history sections from their June 29, 2018 Memorandum in Support of Motion for Preliminary Approval of Class Settlement.  (ECF 82 at pp. 2–9).  This section addresses key events that followed, including the results of the mailing of notice to the Class.

On August 8, 2018, the Court issued an order granting the Motion for Preliminary Approval (Doc. No. 82).  Notice was mailed on August 21, 2018 to 3,245 Class Member borrowers involving 2890 secured obligations. (Exhibit "2", Aff't of Administrator ¶ 5).   If Notice was returned to American Legal Claim Services, LLC as undeliverable from the August 21, 2018 mailing, it was then re-mailed to an updated address after a further address search.  (Id. ¶¶ 6–8).  After the mailing of initial notice, and any re-mailing, 3,132 notice packets were successfully mailed, a penetration rate of approximately 96.52%.  (Administrator's Aff't at ¶ 8).

2

Class Members will receive cash payments of about $1,152.  The settlement provides for checks to be mailed without the need for any claim form to be submitted by the Class Members.

As set forth in the Settlement Agreement and Notice, any Class Member preferring not to receive the debt forgiveness component (for income tax, personal, or other reasons) was permitted to elect not to receive that remedy.   As of October 15, 2018 (six days after the final date for the recipients to act), only four Class Members have elected not to have any deficiency balance forgiven.  (Id. ¶ 13).[2]

## III.   NATURE OF THE SETTLEMENT

### A.  Key Settlement Terms

The significant terms of the class-wide settlement are as follows:

1.    The Trusts have paid Five Million, Seven Hundred Thousand Dollars ($5,700,000.00) into a settlement fund at PNC Bank.  Those funds will be used to pay Class Members, Class Counsel fees and litigation expenses, class representative service awards, all as approved, as well as notice and administration expenses.  (Sett. Agreement, Exhibit "1," ¶ 2.06).

2.    The Trusts will request that all Consumer Reporting Agencies to which they report delete entirely the auto loan tradeline from the Class Members' credit reports. (Id. ¶ 2.09).

3.    The Trusts will waive and eliminate entirely deficiency balances on Class Members' Auto Loans—debt forgiveness of over $14 million.  (Id. ¶¶ 2.10–11, 13).

### B.  Aggregate Value to Class Includes Debt Forgiveness and Credit Correction

There are 2890 secured obligations and 3245 Class Members, including co-borrowers.  The $5.7 million in cash and $14 million in debt forgiveness are substantial remedies that plainly improve the financial position of every affected Class Member.  On top of this $19.7 million

---

[2]    The Class Notice advised Class Members prominently that the debt forgiveness could result in the issuance of an IRS 1099C form, and could result in an income tax liability. (Exhibit "1," at Exhibit C thereto, ¶¶ 7–8 of Notice).

monetary relief, the credit repair provisions will improve Class Members' credit ratings, allowing each to enjoy more favorable borrowing options and interest rates in future credit opportunities.

A notation of "repossession" and reporting of a deficiency balance is a significant negative factor in a consumer's credit report. This can adversely impact a consumer when applying for a loan, insurance, a mortgage, a rental apartment, or even a job, where credit reports are run on candidates with increasing frequency. *See* Lea Shepard, *Seeking Solutions to Financial History Discrimination*, 46 CONN. L. REV. 993, 995 (2014) (noting that "approximately sixty percent of employers consult applicants' credit reports in making hiring decisions").

The Trusts' negative credit reporting will be requested to be "cloaked" (or removed) per the Settlement Agreement. (Exhibit "1," ¶ 2.09). This relief will benefit Class Members well into the future, as negative account data typically remains on a credit report for a period of seven and a half years from the date of first delinquency. See 15 U.S.C. § 1681c(a), § 1681c(c). The credit repair provisions of this Settlement will allow Class Members to improve their ability to apply for security clearances, employment opportunities, obtain insurance at lower rates, and generally increase their creditworthiness. *See* Report of Thomas Tarter, banking and credit expert, Exhibit "3" hereto regarding the significant value of the credit repair. *See Ciccarone v. B.J. Marchese, Inc.*, No. 03-1660, 2004 WL 2966932, *9-10 (E.D. Pa. Dec. 22, 2004) (recognizing, in approving a settlement arising from unlawful auto loans, the value of correction of the consumer's credit report can be approximately equal to the cash component). As Judge Schiller likewise recognized in approving a similar repossession class settlement the "additional obligation to correct negative entries on class members' credit reports is tangible and adds value to the settlement." *Cosgrove v. Citizens Auto. Fin., Inc.*, 2011 WL 3740809, at *7 (E.D. Pa. Aug. 25, 2011). Here, the credit report repair can be considered as adding an additional $5.7 million in value to the $5.7 million in cash.

4

Altogether, this Settlement can be fairly valued at $25.4 million ($5.7 million in cash payout, $5.7 million in credit repair and $14 million in debt forgiveness).

If the Representative Plaintiffs' service awards and Class Counsel fees and expenses are approved, the cash portion of the settlement will be allocated as follows:

| | | |
|---|---:|---|
| $ | 5,700,000 | |
| $ | (37,500) | (Class Administration & Notice) |
| $ | (2,280,000) | (Class Counsel Fees) |
| $ | (32,500) | Litigation Expense Reimbursement) |
| $ | (20,000) | Class Rep Service Awards |
| $ | 3,330,000 | Distributable Net Cash Fund |
| ÷ | 2890 | Secured Obligations |
| $ | 1,152 | Net Cash Per Loan |

## IV.   LEGAL ARGUMENT

This Court has preliminarily determined that class certification appears appropriate for settlement purposes and has preliminarily approved the Settlement Agreement. Having done so, and following the requisite notice to the Class, the Court is now tasked with assessing the fairness of the settlement. By all barometers, this settlement is more than fair, adequate, and reasonable.

### A.   The Settlement Enjoys the Presumption of Fairness

A settlement enjoys an initial presumption of fairness when "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir.), *as amended* (May 2, 2016). All but the last of these questions was addressed at preliminary approval. (See ECF 82, at pp. 22–25). As

to the last question, not a *single* Class Member has objected—a testament to the fairness of the settlement.  Accordingly, the settlement is presumptively fair.

B. **Final Approval Should be Granted**

In determining whether a presumptively fair settlement is entitled to a conclusive finding of fairness, this Court must consider the following factors (known as the "*Girsh*" factors):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re NFL*, 821 F.3d at 437 (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).  The Third Circuit later expanded upon *Girsh* by suggesting additional factors to consider, including:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* (quoting *In re Prudential Sales Prac. Litig.*, 148 F.3d 283, 323 (3d Cir. 1998)).

An evaluation of the relevant factors demonstrates that the settlement here fits well within the range of reasonableness and should be approved.

6

### 1.   The Complexity, Expense and Likely Duration of the Litigation

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation."  *In re NFL*, 821 F.3d at 437 (quoting *In re Warfarin Sodium Antitr. Litig.*, 391 F.3d 516, 535–36 (3d Cir. 2004)).  This case was filed in March 2017, and covers a class period reaching back to November 2015.  Absent this settlement, expensive litigation would continue.

If this case were to continue, there would need to be contested motion practice and argument over the Trusts' challenges on the merits and to class certification.  Dispositive motions would be filed as to liability, damages recoverable under the UCC, setoff issues, and costly pretrial briefing and trial preparation on both sides would be necessary.  With millions of dollars at stake, a costly appeal is foreseeable.  Class Members would be forced to wait out this litigation, and would continue to suffer the impact of their deficiency balances and the adverse credit reporting during the litigation.  Consumers in the 39 states other than Pennsylvania and New York (the two states in the original class definition) would likely get no relief.

Avoidance of this unnecessary expenditure of time and resources benefits all parties and is to be encouraged.  *See In re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) (concluding that lengthy discovery and ardent opposition from the defendant were facts favoring settlement, which offers immediately benefits and avoids delay and expense).  As a result of the settlement, all issues in this litigation will be resolved once and for all for the entire nationwide Class of consumers.

### 2.   The Reaction of the Class to the Settlement Has Been Excellent

As noted, only one Class Member has exercised the right to exclude himself from the case, and not a single class member has objected to the settlement.  (Aff't of Administrator, Exhibit "1," ¶¶ 11–12; *see also* Decl. of R. Duff, ¶ 9, Exhibit 10 hereto).  The absence of objectors (and essential

absence of opt-outs) suggests that the settlement was well-received by the Class.  *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 n.15 (3d Cir. 1993) (following the holdings of other courts in class cases in "assuming silence constitutes tacit consent to the agreement").  The nearly unanimous, positive reaction of the Class here weighs heavily in favor of the proposed settlement.

### 3.   The Stage of the Proceedings and the Amount of Discovery Completed

For a settlement to be approved, the parties must have an "adequate appreciation" of the merits of the case.  *In re NFL*, 821 F.3d at 438.  The settlement here comes only after Plaintiffs litigated this case for two years, evaluated the claims, obtained thousands of documents in discovery, and reviewed the entirety of the record. (Exhibit "4," Flitter Cert., ¶ 32).  Plaintiffs proffered interrogatories and requests for documents primarily targeted at learning the Trusts' standardized practice regarding repossessions and notice, seeking the loan files of potential Class Members, and determining class membership.  (*Id.*).  Class Counsel spent dozens of man-hours in the painstaking manual review and cataloging of these files.  (*Id.*).  All of this was required to evaluate whether the Trusts' repo notices to the class of consumers violated the UCC, and if so, the damages to which they were entitled.

Plaintiffs' counsel traveled to San Diego, California to take the deposition of Defendants' corporate designee Stephanie Jimenez—an employee of the Trusts' loan servicer, First Associates.[3]  (*Id.*).  Plaintiffs also deposed a witness employed by the Trusts' parent company— Oz Management (previously Och-Ziff)—in New York.  Plaintiffs were thereby able to identify the common claim of improper notice(s) and able to identify the total statutory damages and deficiencies at play in the case.  (*Id.*). From this discovery, and from affidavits and summaries provided by the Trusts, Class Counsel learned about the types of notices of disposition utilized by

---

[3]       Mr. Flitter, co-counsel for Mccalvin, Smith and Wise, as well as Mr. Murphy, co-counsel for the Devieses traveled to San Diego.

the Trusts, the size of the Class, and the overall nature of the class-wide violations of the UCC that Plaintiffs have alleged.

As a result of the Plaintiffs' efforts, the litigation had reached the stage where "the parties certainly [had] a clear view of the strengths and weaknesses of their cases." *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 252 (E.D. Pa. 2011); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 461 (D.N.J. 2008).  By the time of the second mediation with Judge Welsh (ret.) in March 2018, considerable discovery had already taken place.  (*See* Flitter Cert. at ¶ 32).  This factor strongly favors approval.

### 4.   The Risks of Establishing Liability and Damages

This factor surveys the possible risks of litigation in order to balance the likelihood of success and potential damages against benefit of settlement.  *In re NFL*, 821 F.3d at 439.  Plaintiffs maintain that liability in this case is strong, *i.e.*, that the Trusts sent out statutorily required notices of disposition of collateral that did not provide important information required by the UCC.

The law supports Plaintiffs in their claims that the Trusts failed to provide "reasonable authenticated notice of disposition of collateral" as required by UCC §§ 9-610 and 9-611.  *See, e.g.*, *Indus. Valley Bank & Trust Co. v. Nash*, 502 A.2d 1254 (Pa. Super. Ct. 1985); *Cubler v. Trumark Fin. Credit Union*, 83 A.3d 235, 236 & n.1 (Pa. Super Ct. 2013); *Coxall v. Clover Commercial Corp.*, 781 N.Y.S.2d 567 (N.Y. Cty. Civ. Ct. 2004).  The notices failed to properly identify the secured party and failed to provide the method of intended disposition.  *Id.* But Plaintiffs' UCC claims are not without risk inasmuch as Defendants could contend the misstatement was *de minimis*, or assert other affirmative defenses.

And although Plaintiffs maintain they are entitled to statutory damages under § 9625(c) of the UCC, the Trusts have asserted a right to set-off the $14 million in deficiency balances they

allege many Class Members owed.  This set-off could theoretically negate a Class Member's statutory damage award.  While Plaintiffs are confident in their positions, they are not without risk. This Settlement obviates these contested issues entirely.

### 5.  The Risks of Maintaining the Class Action Through Trial

This Court made a preliminary determination on certification for purposes of preliminary approval (Doc. No. 90).  Plaintiffs believe each of the elements for class certification under Rule 23 are readily met here, that the Class could have been certified on contest, and that it should be finally certified here for settlement purposes.

However, during this litigation, the Trusts have vigorously contested Plaintiff's motion for class certification on various grounds, including predominance, adequacy, and typicality (ECF 64, *passim*), and because relief for consumers in the other 39 states (beyond Pennsylvania and New York as originally pled) would not have been available.  Settlement eliminates the need to litigate issues that might have posed a threat to certification.  While Plaintiffs believe they have the better of these arguments, as this case is a paradigm class case based on the defectiveness of a uniform notice, this *Girsh* factor favors approval of the settlement.

### 6.  The Ability of the Defendant to Withstand a Greater Judgment

The Trusts are in a unique position because their short-term business model creates a diminished possibility of recovery as this case prolongs.  The Trusts were formed for the purpose of acquiring and collecting on loan accounts from the receiver for Condor Capital Corporation. (Exhibit "5," Sutta Dep. at p. 14:05–19).  The Defendant Trusts are not banks.  Because the Trusts' assets will only continue decreasing over time as the purchased Condor debt is paid down, Class Counsel is reasonably concerned about the ability to collect from the Trusts at the conclusion of protracted litigation.  (*See* Flitter Cert. at ¶ 29).  Prolonged litigation created the significant risk

that the Trusts would have limited or no assets at the conclusion of this litigation, rendering the Class without a remedy.  Accordingly, while the Trusts may be able to withstand a greater judgment in the short term, their ability to pay a year or two from now is far from clear, and is a legitimate concern of Class Counsel.  This prong weighs in favor of approval.

### 7. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and Attendant Risks of Litigation (*Girsh* Factors 8 and 9)

An assessment of the reasonableness of a proposed settlement requires analysis of the present value of the damages a plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing.  *In re NFL*, 821 F.3d at 440.  "[I]n conducting the analysis, the Court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 324 (3d Cir. 2011).

The *best possible recovery* on Plaintiffs' claims – assuming victory on all points of contention – would  have been approximately $28 million.  (*See* Flitter Cert. ¶ 28).  In fact, any trial recovery, even assuming class certification on contest, may well be lower given setoffs and other defenses.

The debt forgiveness component is especially valuable because a pure UCC remedy would not necessarily eliminate the Class Member's remaining loan balance.  Instead, the Trusts' noncompliance with the UCC merely creates a rebuttable presumption in Pennsylvania that the proceeds from the sale of the collateral satisfies the debt obligation.  *See Savoy v. Beneficial Consumer Discount Co.*, 468 A.2d 465, 467–68 (Pa. 1983).  Likewise, a pure UCC remedy does not allow for the credit repair relief contemplated by this Settlement, which will improve the credit rating of all Class Members and allow them to enjoy more favorable borrowing options, interest rates and even <u>employment</u> opportunities. (*See* Tarter report, p. 8, Exhibit "3" hereto).

11

The aggregate relief achieved constitutes relief on par with, or perhaps potentially better than, the very best-case class-certification and trial scenario.  A settlement value akin to the value of the best-case scenario, is, of course, exceedingly rare.   Further, as the Court is aware, a final litigated resolution could be years away with uncertainty throughout trial and appeal.  But with this Settlement, Class Members will get immediate and substantial relief in the form of debt forgiveness, credit repair, and a check in their mailbox—maybe in time for the holidays—of over $1,150.

Class Counsel endorse this settlement because it is very favorable to the Class for the reasons just described.  (*See* Flitter Cert. ¶ 28).  The opinion of experienced Class Counsel that settlement is in the best interest of the Class is entitled to "significant weight." *Good v. Nationwide Credit, Inc.*, 314 F.R.D. 141, 159 (E.D. Pa. 2016) (Robreno, J.).

### 8. <u>Additional Factors All Support Grant of Final Approval</u>

In considering the relevant factors discussed in *Prudential*, the Court should find that (a) the pleadings, settlement negotiations, and the examination of factors related to potential class certification have developed the underlying substantive issues such that all parties appreciate the merits of the claims; (b) members of the Class have been provided with adequate notice, and have had a sufficient opportunity to opt out of the settlement; (c) the award to the Representative Plaintiffs, discussed below, is fair, adequate and reasonable; and (d) the cash distribution (without any need for a claim form) assures that every Class Member who is reachable can enjoy the benefits of the Settlement with minimal burden.  It also bears note that the Trusts do not have a right to reverter of any undistributed funds. (Exhibit "1," Sett. Agreement ¶ 2.06).  These factors weigh heavily in favor of approval of the proposed settlement of this consumer class action.

12

### C.  Class Representative Service Awards

The Settlement Agreement permits Ms. Mccalvin, Mr. Smith and Ms. Wise to receive a service award of $5,000.00 each, and for Mr. and Mrs. Deviese to share a $5,000 award.  (Exhibit "1," Sett. Agreement ¶ 2.15).  The Plaintiffs each personally met with counsel several times, engaged in many phone conversations about the status of their case, kept abreast of discovery and other matters mailed to them, and generally went out of their way to serve the best interest of the Class at their own expense of time and energy.  Ms. Mccalvin was deposed in Philadelphia and Mr. Smith was deposed in New York City.  (Exhibit "4," Flitter Cert. ¶ 35).

The awards to Tara Mccalvin, Ghani Smith, Holli Wise, and James/Theresa Deviese are appropriate and comport with similar incentive or service awards in representative actions in this District.  *See, e.g.*, *Brown v. Rita's Water Ice Franchise Co. LLC*, 242 F. Supp. 3d 356, 372 (E.D. Pa. 2017) ($5,000 incentive awards reasonable); *see also Cosgrove*, 2011 WL 3740809, *10 ($7,500 service award in UCC repo notice class action under Pennsylvania law).

### D.  Cy Pres Distribution of Unremitted Funds

In the event there are any uncashed checks pursuant to the terms of the Settlement Agreement, those funds are to be disbursed as a *cy pres* distribution in equal one-third shares to National Legal Aid and Defenders Association, Washington, D.C.; Community Legal Services of Philadelphia, PA; and the National Consumer Law Center, Boston, MA.  (*See* Exhibit "1," Sett. Agreement ¶ 3.05).  Per the terms of the Settlement Agreement, these funds are to be used for consumer credit education and counseling, foreclosure prevention, and advocacy on behalf of low-income consumers.  *See In re Baby Products Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013) (*cy pres* distribution of excess settlement funds to a third party to be used for a purpose related to the class injury); *Perry v. Fleet Boston Fin. Corp.*, 229 F.R.D. 105, 117 (E.D. Pa. 2005) (recognizing

13

that *cy pres* distribution would "help address the problems that necessitated the filing of this lawsuit originally").[4]

###     E.   The Class Should be Certified

Plaintiffs' argument for class certification was set forth at length in the Motion for Preliminary Approval. (ECF 82 at pp. 11–21).  The only new factor to be addressed is the response of the Class to the notice of Settlement.  With no objections to the Settlement and only one exclusion request, the response of the Class can only be deemed excellent.  This, of course, supports the grant of certification for purposes of implementing the instant settlement.  Plaintiffs incorporate their arguments in support of class certification made at preliminary approval (ECF 82 at pp. 11–21), where each of the Rule 23(a) and 23(b)(3) elements was addressed.

###     F.   Class Counsel Fees are Reasonable and Should be Approved

####         1.   The Equitable Foundation for Award of Attorneys' Fees in Representative Actions

The Supreme Court has long held that one who successfully pursues a lawsuit that creates a common fund is entitled to reasonable compensation from the fund as a whole.  *Trustees v. Greenough*, 105 U.S. 527 (1882); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The underlying justification for attorney reimbursement from a common fund, as explained by the Supreme Court in three early cases, is that unless the costs of litigation are spread to the beneficiaries of the fund, they will be unjustly enriched by the attorney's efforts." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) (collecting cases).  Our Circuit is in accord. *In re Gen. Motors*, 55 F.3d at 821; *In re Cendant Corp.*, 264 F.3d 201, 256-57 (3d Cir. 2001).  The financial inducements offered by the class action procedure have played an important role "in

---

[4]     Class Counsel expect to file a report with the Court following distribution setting forth the amount of funds remaining and a recommendation as to any second distribution before *cy pres* distribution.

vindicating the rights of individuals who might otherwise not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980).

The importance of contingent fee-based litigation is particularly evident in the context of consumer protection cases such as this one.  The Courts have consistently recognized the value of private litigation as a necessary and desirable tool to assure the effective enforcement of the consumer protection, securities, and antitrust laws.  *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 781 (3d Cir. 2009); *see also Perry*, 229 F.R.D. at 123 (stating that many consumer claims would be ignored but for the consumer class action).  As explained below, the requested fee of $2,280,000 is reasonable in its own right, as confirmed by the "lodestar cross-check." *Brown*, 242 F. Supp. 3d at 361 (awarding "percentage of recovery" fee award after testing it against the lodestar cross-check).

### 2. <u>Plaintiffs' Fee Request from the Common Fund is Fair and Reasonable and In Line With Awards Approved in Similar Cases</u>

 "In common fund cases such as this one, the percentage-of-recovery method is generally favored because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006); *accord In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 734 (3d Cir. 2001) ("The percentage-of-recovery method has long been used in this Circuit in common-fund cases.").  The "percentage of recovery approach is usually appropriate where the efforts of counsel have generated a "common fund" from which the class and counsel are to be compensated." *Ciccarone*, 2004 WL 2966932 at *3 (citing *In re General Motors*, 55 F.3d at 821).

In determining the reasonableness of the percentage-based fee requested, this Court considers the *Gunter* and *Prudential* factors, which include:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, ... (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000); and *In re Prudential*, 148 F.3d at 336–40). As described below, analysis of these factors supports the requested fee of $2,280,000, plus reimbursement of litigation expenses of $32,500.

a.    **The size and nature of the common fund created, and the number of persons benefited**

As noted, the cash portion of the common fund here consists of $5.7 million. In addition, there is over $14 million in debt forgiveness, plus valuable credit report correction. As noted, in *Ciccarone*, 2004 WL 2966932, the Court considered the value of a very similar credit repair provision in a class settlement and concluded that "the most straightforward method for estimating the value of the equitable relief is to have it equal the value of the monetary relief [the cash component]." *Id.* at *10. By this measure, the aggregate value of the settlement would be some $25.4 million ($5.7 million in cash + $5.7 million in credit reparation + $14 million in debt forgiveness).

By this benchmark, Class Counsel fees requested represent just under 9% of the aggregate value (and 40% of the common fund cash). If fees and costs are approved as requested, the cash

distribution will be about $1,152 per secured obligation.[5] Co-borrowers will divide their share of the settlement. The cancelled deficiency balances amount to an estimated average benefit of about $4,844 per secured obligation (colloquially "per loan."). When divided by only those Class Members with deficiency balances claimed, the forgiveness comes to $8,046 per Class Member. These benefits to the class weigh heavily in favor of the requested percentage fee award.

### b. The absence of objections to the request for fees supports approval

The second factor focuses on the reaction of the Class to the requested attorney fees. The "absence of large numbers of objections mitigates against reducing fee awards." *Perry*, 229 F.R.D. at 123–24; *In re Diet Drugs Prod. Liab. Litig.*, 553 F. Supp. 2d 442, 473 (E.D. Pa. 2008) (dearth of objections "signifies that the requested award has been viewed by interested parties to this action as fair"); *see also In re Rite Aid*, 396 F.3d 294, 305 (3d Cir. 2005) (affirming district court's finding that the filing of but two objections weighed in favor of awarding fee).

The Class Notice stated that Class Counsel would apply for an award of fees and expenses out of the settlement proceeds of up to $2,280,000 plus up to $32,500 in expenses. (Exhibit "1," at Ex. "C" thereto, Notice ¶ 17). Not a single Class Member has objected to the requested fees and costs. This favors approval of the attorney fees sought here.

### c. The skills and efficiency of Class Counsel

The "single clearest factor reflecting the quality of Class Counsels' services to the Class are the results obtained." *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013). Related factors include "the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel

---

[5]    Plaintiffs use the term "secured obligation" to refer to a single vehicle loan or finance where the vehicle was repossessed. There is only one recovery even if more than one repossession of the same car, and the recovery will be divided if there are co-obligors. As noted, because some loans have co-obligors, there are 3245 Class Members but only 2890 secured obligations.

prosecuted the case and the performance and quality of opposing counsel." *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 465 (E.D. Pa. 2008) (internal citations and quotations omitted). The goal under our Circuit's precedent is to ensure "that competent counsel continue to undertake risky, complex and novel litigation" for the benefit of large numbers of class members who might otherwise lack reasonable access to justice. *Gunter*, 223 F.3d at 198.

Here, Class Counsel have obtained a very substantial and definite monetary benefit for the class of consumer borrowers as efficiently as possible considering the multi-state class certification issues, the Trusts' defenses and setoffs, and the Trusts' diminishing assets. In the absence of this litigation, most of the Class members would have lacked any reasonable access to legal representation to pursue their modest statutory claims under Article 9 of the UCC—a statute whose remedy notably does not contain a fee-shifting provision. *See, e.g.*, 13 Pa. C.S. § 9625(c).

As set forth in the Certifications of Cary L. Flitter, Andrew M. Milz, Jody T. López-Jacobs, Seth R. Lesser, Robert W. Murphy, and Robert Duff, Class Counsel have considerable experience litigating consumer class actions such as this one and are recognized as having expertise in the field. (See Exhibits "4" and "6" through "10"). *See, e.g.*, *Cosgrove*, 2011 WL 3740809, at *9 ("Class counsel [Flitter and Milz] submitted high-quality work to the Court throughout this litigation, and they pursued the case vigorously against able opposing counsel."); *Craig v. Rite Aid Corp.*, No. 08-2317, 2013 WL 84928, at *8 (M.D. Pa. Jan. 7, 2013) ("To say that Class Counsel [i.e. Mr. Lesser] vigorously prosecuted this action would be a gross understatement.").

Class Counsel's experience and skill are also evident in the very effective and efficient prosecution of the claims—including the substantial settlement—against well-matched, well-financed opponents. *See In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (recognizing as a "significant factor" the "quality of representation"). Counsel were

18

successful in reaching this excellent settlement through two days of mediation, dealing with the difficult issues and delays occasioned by parallel litigation, then stewarding this settlement through preliminary approval.  Throughout this case, the Trusts have been represented by highly skilled and experienced attorneys from SIDLEY & AUSTIN, from O'HAGAN MEYER, LLC, and from PRYOR CASHMAN, LLP, three prominent national law firms.  These factors militate in favor of approval of the requested fees.

### d.  The complexity and duration of the litigation

Complexity and duration of the litigation is another factor the Court considers in analyzing Class Counsel fees.  This case is now over 18 months old, and the Complaint has undergone three amendments to account for the unique posture of the Trusts, parallel litigation in Indiana, and factual developments in the case that posed issues for class certification.

Plaintiffs initially incurred their auto loan obligations with Condor Capital Corporation ("Condor"), a provider of subprime auto loans.  Plaintiffs learned that Condor was placed under a receivership at the behest of the New York State Department of Financial Services.  *See Lawsky v. Condor Capital Corp.*, 154 F. Supp. 3d 9 (S.D.N.Y. 2015).  During the receivership, the receiver sold off Condor's loans to various entities including an entity that later transferred the loans it purchased to the Trusts.[6] (Exhibit "5," Sutta Dep. at p. 14:05–19).

Plaintiff's Amended Complaint asserted UCC Article 9 claims against the Trusts, Condor, and the receiver for Condor.  The Amended Complaint sought relief for a two-state class consisting of Pennsylvania and New York consumers represented by putative class representatives Tara

---

[6]     Discovery in this case revealed that the loans switch hands among the Trusts throughout the life of the loans. Upon the occurrence of a modification or repossession, the loan moves to Condor AssetCo Securitization Trust, which becomes the secured party.   The Trusts themselves did not oversee the loans, but instead delegated management of the loans (and the sending of repo notices) to a third party loan servicer called First Associates, Inc.  (Ex. "11," Jimenez Dep. at pp. 11:04–25, 15:15–21, 59:21–60:11).

Mccalvin and Abdullah Ansari, respectively.  (ECF 2).  However, it was later discovered that Mr. Ansari could not proceed against the Trusts because his repossession notice was sent by Condor, which has virtually become judgment proof following the receivership and cessation of operations. Plaintiffs accordingly filed their Second Amended Complaint, which added Ghani Smith as a party and putative class representative for the New York class, and removed Ansari, as well as the receiver. (ECF 59).

Before the instant litigation began, a separate nationwide class action was filed against the Trusts in Indiana in a case captioned *Deviese v. Condor Securitization Trust*, No. 25D01-1701-CT-31 (Fulton Cty. Super. Ct.), removed to the United States District Court for the Northern District of Indiana at Docket No. 17-cv-168-JD-MGG.  The parallel class actions could have created procedural complexities resulting in prolonged litigation, but instead, counsel for plaintiffs in the Indiana case collaborated with counsel for Plaintiffs in this action to coordinate the two cases.  Plaintiffs thereafter filed their Third Amended Complaint, which (among other things) added the Deviese plaintiffs and asserted a nationwide UCC class against the Trusts.  This relatively seamless coordination could not have been achieved but for Class Counsel's experience and expertise in consumer class actions such as this.

Although Plaintiffs' theory of liability under the UCC is relatively straightforward, the Trusts raised a number of substantial issues during the class certification briefing that added to the procedural complexity of the case.  For instance, the Trusts argued that Ms. Mccalvin was atypical and an inadequate representative of the Pennsylvania class in light of a prior conviction and bankruptcy proceeding.  (ECF 64, at pp. 13–16).  This challenge in part prompted the addition of Holli Wise—also a Pennsylvania resident—as an additional class representative in the Third Amended Complaint, and a multi-state, national class was pled.  (ECF 79).

It is also noteworthy that final approval does not end the complexities (or work) to be faced by Class Counsel.  Class Counsel can expect to deal with a stream of future phone calls and letters from Class Members and their family or lawyers related to: non-receipt or incorrectly addressed checks, credit reporting that had not yet been corrected, ongoing (if rogue) collection efforts, and the like.  (*See* Exhibit "4," Flitter Cert. ¶ 33, attesting to continued post-approval work).  Assuring the settlement terms are carried out will require additional work and attention.  This factor further supports the fee application, and the reasonableness of the request.

### e.  The risk of nonpayment

Class Counsel undertook this action on an entirely contingent fee basis, assuming a substantial risk that counsel would have to devote a significant amount of time and incur expenses in prosecuting this action without any assurance of being compensated for their efforts.  Indeed, Class Counsel have not been compensated for any of their time or efforts since this matter was filed in 2017, while expending over $32,500 in expenses for filing fees, mediation fees, travel, depositions, and the like.  In cases such as this where class counsel incurs thousands of dollars in costs and expenses while facing the risk of not being reimbursed, "[t]he risk of nonpayment, therefore, weighs in favor of granting the requested fee award."  *Wallace v. Powell*, No. 09-0291, 2015 WL 9268445, at *19 (M.D. Pa. Dec. 21, 2015).

One factor informing the decision to settle was the diminished possibility of recovery in prolonged litigation given the Trusts' short-term business model.  As stated, the Trusts were formed for the purpose of acquiring loan accounts from the receiver for Condor and collecting on those loan accounts.  Because the Trusts' assets will only continue decreasing over time, Class Counsel was reasonably concerned about the ability to collect from the Trusts at the conclusion of protracted litigation. The Trusts' loan servicer, First Associates, had purchased $4 Million in

insurance coverage from Scottsdale Insurance, (Ex. "11", Jimenez Dep. at pp. 84:1-19, 85:9-13), but Scottsdale has made a reservation of rights and Class Counsel was advised that the $4 million policy had "wasted" down by nearly $1 million to cover the substantial defense costs. (*See* Flitter Cert. at ¶ 29).  The Trusts are contributing to the balance of this settlement themselves, Plaintiffs understand.

While Plaintiffs remain confident in the strength of their case, and of their ability to prove damages, this action, indeed all litigation, involves substantial risks and the ultimate outcome cannot be predicted with certainty.  Accordingly, the risk of nonpayment in this case weighs in favor of approving the fees sought in this Motion.

### f.   The amount of time devoted to the litigation

While not seeking fees based upon a lodestar approach, Class Counsel (all four firms) have spent about 1558 hours to date prosecuting this case on behalf of the Class, for an aggregate lodestar of $873,649 and have incurred $33,666 in expenses.  A table reflecting the time incurred by each firm is set forth below:

| Law Firm | Hours | Lodestar |
|---|---|---|
| Flitter Milz, PC | 791 | $417,763.00 |
| Klafter Olsen & Lesser | 414.15 | $238,819.00 |
| Murphy Law Firm | 226.5 | $141,562.00 |
| The Law Office of Robert E. Duff | 126.9 | $75,505.00 |
| TOTAL LODESTAR | | $873,649.00 |

Among other important tasks associated with this litigation, Class Counsel incurred significant time on, for example: client intake, legal research, background research on Defendants; familiarizing themselves with receivership proceedings against Condor in the Southern District of

22

New York; drafting of written discovery requests; reviewing responses to discovery; reviewing, analyzing, and cataloguing thousands of pages of class member documents provided by the Trusts; participating in conferences and hearings before the Court; compiling class data and drafting the motion for class certification and supporting memoranda; engaging in the mediations and settlement discussions, drafting and re-drafting the settlement agreement; moving for preliminary approval; overseeing appointment of a certified Class Administrator and mailing of notice; requesting and overseeing limited remailing of Notice; and moving for final approval and for the award of attorney fees and costs.  (Exhibit 4, Flitter Cert. ¶ 32; Exhibit 8, Lesser Decl. ¶ 5).

In light of the discovery completed, the motion practice and legal briefing, and the extensive work devoted to negotiating and structuring the settlement, and future work (which counsel anticipate will include continued calls from Class Members and assorted professional time associated with overseeing administration of the settlement and correction of credit reporting), this factor supports Class Counsel's fee request.

### g.  Awards in similar cases

As noted, the value of the settlement here is approximately $25.4 million – $5.7 million in cash, over $14 million in debt forgiveness, and valuing the credit repair at an additional $5.7 million.  (Sett. Agreement ¶¶ 2.06, 2.09–2.10).  The $2,280,000 fee award requested in this case is just under 9% of the aggregate value of the relief obtained.  As noted, the credit repair is quite valuable to the Class Member.  *See Ciccarone*, 2004 WL 2966932, *9-10 (acknowledging value of credit correction and adding value to settlement for calculation of approved fee); Tarter Expert Report at pp. 12-16, Exhibit "3" hereto).

Even evaluating the $2,280,000 requested fee as a percentage of the $5.7 million cash fund alone—which does not adequately evaluate the extent of the settlement value—reveals a

percentage of 40%.  This is still well within the range of reasonable fees requested and awarded by courts in this Circuit.  *See Cendant*, 243 F. 3d at 736 (fee awards range from 19% to 45%).

The 9% of the aggregate relief (or 40% of the cash) is comparable to Class Counsel fee awards sought and approved in similar class cases involving improper repossession practices.  *See, e.g.*, *Cosgrove*, 2011 WL 3740809, at *9 (approving fees at 11.7% of aggregate relief before considering credit repair; 42.5% of cash); *McCall v. Drive Fin.*, No. 00005, 2010 WL 4150875 (Phila. CCP July 21, 2010) (approving fees at approximately 5% of aggregate relief; 42.5% of cash).

A comparison of the fee sought here with fees awarded in recent class actions militates strongly in favor of granting the Fee Petition.  All the *Gunter* factors are clearly satisfied; the request for fees should be granted.

### 3.  <u>Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee</u>

While the percentage of the fund approach is preferred especially in class actions that do not arise under fee-shifting statutes, the Court of Appeals has recommended that district courts employ a lodestar cross-check.  *In re Rite Aid*, 396 F.3d at 305–06.  This compares Class Counsel's billings on an hourly basis for time expended (lodestar) against the fee as computed on a percentage basis.  Lodestar "multipliers ranging from one to four are frequently awarded in common fund cases employing the lodestar method."  *Perry*, 227 F.R.D. at 122.

The Third Circuit has instructed that "the lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district courts may rely on summaries submitted by the attorneys and need not review actual billing records."  *In re Rite Aid*, 396 F.3d at 306–07.  Moreover, the "lodestar cross-check is 'not a full-blown lodestar inquiry' and a court 'should be satisfied with a summary of the hours expended by all counsel at various stages with

less detailed breakdown than would be required in a lodestar jurisdiction.'" *Id.* (quoting *Report of the Third Circuit Task Force, Selection of Class Counsel*, 208 F.R.D. 340, 423 (2002)).

Following the requirements of the Third Circuit articulated in *Rite Aid*, Plaintiffs set forth a summary of the tasks involved in this litigation in IV.F.2.f. above.[7]  (See also Flitter Cert., Exhibit "4" ¶ 32).  A summary of the hourly rates employing the fee structures of all the attorneys and staff working on the case is listed below, which yields a lodestar of $873,649.00.

**Flitter Milz, P.C.**

| Name | Title | Hours | Hourly Rate | Amount |
|---|---|---|---|---|
| Cary L. Flitter | Partner | 494 hours | $705.00 | $348,552.00 |
| Andrew M. Milz | Partner | 13.80 hours | $405.00 | $5,589.00 |
| Jody T. López-Jacobs | Associate | 136.40 hours | $255.00 | $34,782.00 |
| Shelley Reinhart | Associate | 19.50 hours | $210.00 | $4,095.00 |
| Joan M. Raughley | Paralegal | 66.40 hours | $195.00 | $12,948.00 |
| Clerk | Paralegal | 60.50 hours | $195.00 | $11,797.00 |
| **LODESTAR TO DATE** | | | | **$417,763.00** |

(Flitter Cert., Exhibit "4," ¶ 31).

**Klafter Olsen & Lesser LLP**

| Name | Title | Hours | Hourly Rate | Amount |
|---|---|---|---|---|
| Seth Lesser | Partner | 119.9 | $925 | $110,908 |
| Fran Rudich | Partner | 5.0 | $850 | $4,250 |
| Michael Reed | Associate | 183.8 | $495 | $90,956 |
| Myra Monteagudo | Paralegal | 56.9 | $310 | $17,639 |
| Nancy Velasquez | Paralegal | 22.4 | $310 | $6,944 |

---

[7]     Although the Court of Appeals jurisprudence calls for summaries, counsel's detailed timesheets can certainly be made available to the Court, if requested.

| Veronica Byriter | Paralegal | 0.4 | $310 | $124 |
|---|---|---|---|---|
| Yolanda Siders-Lewis | Paralegal | 25.8 | $310 | $7,998 |
| **LODESTAR TO DATE** | | | | **$238,819** |

(Lesser Decl., Exhibit "8" ¶ 10).

### Murphy Law Firm

| **Lawyer** | **Hours** | **Hourly Rate** | **Amount** |
|---|---|---|---|
| Robert W. Murphy | 226.50 | $625 | $141,562.00 |
| **LODESTAR TO DATE** | | | **$141,562.00** |

(Murphy Decl., Exhibit "9" ¶ 17).

### The Law Office of Robert E. Duff

| **Lawyer** | **Hours** | **Hourly Rate** | **Amount** |
|---|---|---|---|
| Robert E. Duff | 126.90 | $595 | $75,505.00 |
| **LODESTAR TO DATE** | | | **$75,505.00** |

(Duff Decl., Exhibit "10" ¶ 19).

| **TOTAL LODESTAR FOR ALL FIRMS (Through October 19, 2018)** | **$873,649.00** |
|---|---|

At $2,280,000 in fees requested, this results in a modest multiplier of about 2.6 – before accounting for future services in administration, check and payment issues, class member and administrator issues involving address and check payees, credit report correction, lingering credit reporting issues that impede future credit granting to class members, and lingering (or even rogue) collection efforts by collectors unaware of the settlement.  This added time, while admittedly hard

to quantify in advance, will increase the lodestar and depress or eliminate any multiplier.  To state the obvious, the 2.6 multiplier is below the 3.0 multiplier approved as reasonable by the Third Circuit in *In re Cendant*, 243 F.3d at 734.

Class Counsel have filed herewith their own certifications (Exhibits "4" and "6" through "10").  Flitter Milz has substantial experience litigating consumer class actions in federal and state court, specifically including multiple repossession class actions.  The *Cosgrove* case from this Court and the seminal 2013 appellate decision clarifying the UCC notice requirements and statute of limitations were the product of the Flitter firm.  *Cubler*, 83 A.3d 235.   (Flitter Cert., Exhibit "4," ¶¶ 23–25).  This Court recently approved the 2017 rates of Mr. Flitter and Mr. López-Jacobs, relying in part on the Community Legal Services ("CLS") fee schedule.[8] *Homer v. Law Offices of Frederic I. Weinberg & Assocs., P.C.*, No. 17-880, 2018 WL 2239556, at *3 (E.D. Pa. May 16, 2018) ($675 for Flitter; $240 for López-Jacobs).  The hourly rates of Messrs. Milz ($405) and López-Jacobs ($255) are comfortably within the range for attorneys with comparable experience, given their 3-plus and 10-plus years' experience.  (Flitter Cert., Exhibit "4," ¶¶ 24–25).  Mr. Flitter's 2018 rate of $705 is slightly above the range of rates for counsel with 25-plus years' experience, but given his "tenure and experience in the consumer litigation field," *Homer*, 2018 WL 2239556, at *3, the requested rate accurately captures Mr. Flitter's experience and expertise, and represents a modest 4% increase over 2017 rates.  (Flitter Cert., Exhibit "4," ¶ 23).

Mr. Duff's rate of $595 likewise fits comfortably within the rates of attorney with more than 25 years of experience ($620–650).  Mr. Duff has litigated hundreds of consumer cases in

---

[8]     Attorney Fees, Community Legal Services, https://clsphila.org/about-cls/attorney-fees (accessed Oct. 16, 2018).  As stated by this Court, the CLS survey "does not consider the attorney's experience in the relevant field, the level of participation in a case, and reputation in the field." *Homer*, 2018 WL 2239556, at *2.

federal district courts, teaches seminars on consumer law topics, and has been certified as lead or co-lead counsel in both national and Indiana class actions. (Exhibit "10," Duff Decl. ¶¶ 10–13).

Mr. Murphy's rate of $625 also accurately captures his experience and expertise in litigating consumer class actions. (*See* Murphy Decl, ¶ 32, Exhibit 9). In addition to his substantive consumer class action litigation experience (*id.* ¶¶ 23-24), Mr. Murphy regularly teaches, lectures, and writes on consumer law topics. (*Id.* ¶¶ 14-22).

Finally, the rates of the New York firm of Klafter Olsen & Lesser are the rates charged to paying clients and accurately reflect the knowledge, experience, and reputation of the firm, which has successfully litigated dozens of class actions resulting in several multimillion dollar recoveries, and has served as lead counsel in no less than six MDLs. (Lesser Decl., Exhibit "8," ¶ 10 and Exhibit A thereto at p. 1). Mr. Lesser was the 2005 Attorney of the Year for the National Association of Consumer Advocates, is a contributor and editor of the *Consumer Class Actions* treatise published by the National Consumer Law Center, and is a leader in the field of consumer class action. (*Id.* at pp. 2–3).

The requested fees (i) have not met with any objection from a Class Member, (ii) satisfy all the *Gunter* factors, (iii) comport with market measures for typical contingent fee representation, (iv) reflect a lodestar multiplier that is well within the range of multipliers typically approved by courts in the Third Circuit, and (v) reflect the high level of success achieved. Accordingly, Class Counsel respectfully submit that this Fee Petition should be approved, and fees awarded from the common fund in the sum of $2,280,000.

### 4. **Reimbursement of Class Counsel's Expenses**

It is axiomatic that counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case. *Brown*, 242 F. Supp. 3d at 371.

Class Counsel, in the prosecution of this case, expended a total of $33,666 in litigation expenses. The bulk of the expense ($17,386) was incurred by the Flitter Milz firm, as summarized in the Flitter Certification. (Flitter Cert., Exhibit "4" ¶ 34). Flitter Milz's expenses included shared costs for two days of mediation at JAMS, travel expenses for out-of-town trips, filing fees, deposition transcripts, expert report fees, federal express and the like. (*Id.*). Klafter Olsen & Lesser incurred $2,970 in costs for travel expenses, bulk copying costs, filing fees, subpoena fees and expenses and the like. (Exhibit "8," Lesser Decl. ¶ 13). Mr. Murphy incurred $10,629.00 in travel expenses, shared mediation fees, filing fees, and transcription fees. (Exhibit "9," Murphy Decl. ¶ 33). Mr. Duff incurred $2,681.00, mostly for travel expenses and filing fees. (Exhibit "10," Duff Cert. ¶ 20).

These expenses were critical to Class Counsel's success in achieving the settlement. They are reasonable and necessary. Although the expenses sum to $33,666, Class Counsel caps its request for expense reimbursement at $32,500 as set forth in the Class Notice. Expenses are entirely reasonable and should be approved in the sum of $32,500.

## V.    <u>CONCLUSION</u>

For the reasons detailed herein, Plaintiffs Tara Mccalvin, Ghani Smith, Holli Wise, James

C. Deviese, and Teresa Deviese respectfully request that this Court grant their Motion for Final

Approval, for the Award of Attorneys' Fees and Expenses and Service Awards.

Respectfully submitted:

Date:  <u>October 22, 2018</u>

<u>/s/ Cary L. Flitter</u>
CARY L. FLITTER
ANDREW M. MILZ
JODY THOMAS LÓPEZ-JACOBS
**FLITTER MILZ, P.C.**
450 N. Narberth Ave., Suite 101
Narberth, PA 19072
(610) 822-0782

SETH R. LESSER (*Pro Hac Vice*)
MICHAEL H. REED (*Pro Hac Vice*)
**KLAFTER OLSEN & LESSER LLP**
Two International Drive, Suite 350
Rye Brook, NY 10573
Phone: (914) 934-9200
Facsimile: (914) 934-9220

ROBERT W. MURPHY (*Pro Hac Vice*)
**MURPHY LAW FIRM**
1212 S.E. 2nd Avenue
Ft. Lauderdale, FL 33316
Phone: (954) 763-8660

ROBERT E. DUFF (*Pro Hac Vice*)
**THE LAW OFFICE OF ROBERT E. DUFF**
P.O. Box 7251
Fishers, IN 46037
Phone: 800-817-0461

**Attorneys for Plaintiffs and the Class**